IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Isaac Evans, | ) | No. CV 06-167-TUC-CKJ (HCE) |
| Plaintiff, | ) ) | **REPORT & RECOMMENDATION** |
| vs. | ) ) | |
| Michael J. Astrue,[1] Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) ) | |

On April 4, 2006, Plaintiff, through counsel, filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). On that same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report & Recommendation pursuant to the Rules of Practice of this Court.

Pending before the Court are the parties' Cross-Motions for Summary Judgment. For the following reasons, the Magistrate Judge recommends that the District Court deny Plaintiff's Motion for Summary Judgment (hereinafter "Plaintiff's MSJ") and Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ") and remand this matter for further proceedings consistent with this Report and Recommendation.

---

[1]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

I.    PROCEDURAL HISTORY

On December 15, 2003, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") applications for disability insurance benefits and disability under Titles II and XVI, respectively, of the Social Security Act alleging inability to work due to multiple surgeries.  (TR. 90-102, 345-347)   Plaintiff indicated that he had been unable to work since March 15, 2003.[2]   (TR. 90, 345) Plaintiff's applications were denied initially and on reconsideration. (TR. 64, 70, 349, 354)

Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") and the matter came on for hearing on January 31, 2005 before ALJ Frederick J. Graf.  (TR. 74, 374-392) Plaintiff, who was represented by counsel at the hearing, was the only witness to testify.  On March 15, 2005, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (TR. 48-55)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 43) The Appeals Council, after considering additional evidence submitted by Plaintiff, denied Plaintiff's request for review thereby rendering the ALJ's March 15, 2005 decision the final decision of the Commissioner.  (TR. 5-8)   Plaintiff then initiated the instant action.

II.    THE RECORD ON APPEAL

A.    Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on September 13, 1955  (TR. 378) Plaintiff is the divorced father of one daughter who lives with her mother.  (TR. 377-378)   At the time of the hearing, Plaintiff lived by himself in a trailer.  (TR. 377) Plaintiff is right-handed.  (TR. 378)

Plaintiff has a high school education, an Associates of Science degree in respiratory therapy, and two years of college credits in business.  (TR. 378) Plaintiff's May 4, 2004

---

[2]Elsewhere in the record Plaintiff stated that he stopped working due to his impairments on various dates in 2002.  *See infra* at pp. 27-29.

Work History Report indicated that he worked as a respiratory care practitioner[3] from February 2001 through September 2002.  (TR. 95)  In his May 4, 2004 Disability Report, Plaintiff stated that he quit working on June 15, 2002 because he was "compromising my physical abilities." (TR. 99)  He testified at the hearing that he was "employed as a respiratory therapist until the injuries stopped me from working..." and that he last worked in "July of 2002, if I'm not mistaken.  I may be wrong but I think the records will reflect correctly the date."  (TR. 379)

Plaintiff stopped working because he "couldn't pick up anything.  I couldn't take a normal gait, walking and I began experiencing a kind of distended, bloated abdomen area and it was restricting me....It was pretty much impossible for me to bend over with [sic] losing whatever I consumed.  I had no way of keeping food down.  I couldn't do regular daily movements or requirements" of work.  (TR. 379-380) Plaintiff's abdominal problems also cause belching.  (TR. 384-385)

In October 2001, Plaintiff was involved in an automobile accident.  (TR. 379) Plaintiff testified that he was not hospitalized after the accident and at that time he did not know he was hurt. (TR. 387) Plaintiff's statements in the record also indicate that he attributes his inability to work to injuries he sustained in that accident. (TR. 379, 387) However, he did not seek medical treatment after the accident because he did not have insurance.  (TR. 379) The injuries ultimately required him to have approximately 13 surgeries.[4]  (TR. 387)  He scheduled the surgeries to provide recovery time between each surgery.  (Id.)

───────────────

[3]Plaintiff indicated that his work as a respiratory care practitioner required: standing and walking up to 6 hours daily; reaching, writing, typing or handling small objects up to 12 hours daily; lifting up to 20 pounds and frequently lifting up to 10 pounds.  (TR. 96)

[4]When Plaintiff obtained insurance authorization in 2003, he sought medical treatment (*See* TR. 379)  Plaintiff's surgeries were paid for through the Arizona Health Care Cost Containment System.  (TR. 20, 382, 391)

Through a vocational rehabilitation assistance program, Plaintiff has been taking nursing classes at a community college since September 2004. (TR. 269, 381, 389, 391) The semester before the hearing, he had successfully completed 16 hours of classes. (TR. 380-381, 389; (*see also* TR. 391 Plaintiff received "straight As"))[5] During that semester, he attended classes despite difficulties caused from foot surgery. (TR. 389) His classes took place "in a vocational rehab area where they have all the students that have disabilities. In that same room with me there are paraplegics, people who have handicaps, physical or mental..." (TR. 382) When in class, Plaintiff was unable to sit the entire time; instead, he walked out from time to time. (TR. 383) Through his program he was able to attend classes only on one side of the campus; otherwise he would not have been able to attend classes because of inability to walk across the campus. (TR. 390)

Plaintiff testified that as of the date of the hearing, he was unable to perform light work because of problems with his feet which make him unable to stand for "very long"; he is still experiencing nerve problems in the left leg; his shoulder and knee are "rehabilitating"; he cannot close his finger all the way nor can he move it like he would like; and he cannot sit for long periods. (TR. 383) He also testified that he could presently walk for approximately 30 minutes and stand for approximately 30 minutes at a time. (TR. 390) Plaintiff has scheduled surgery to address his abdominal problems during a vacation period from his classes. (TR. 385) Plaintiff did not think he could work until after his next surgery. (Id.) Plaintiff did not believe there was any work he could perform since October 2001. (TR. 389)

---

[5]At the hearing, Plaintiff's counsel stated that if the ALJ determined that Plaintiff is not disabled because Plaintiff is able to take classes "to become a full time nurse...we argue in the alternative give him a closed period of disability up until September of 2004 up until when he did start going back to school full time getting straight As because prior to that he had a succession of surgeries and recovery and being in the care center." (TR. 391)

Plaintiff has also received assistance from COPE Behavioral Health Services (hereinafter "COPE") for depression and anxiety.  (TR. 388) When he first started treatment at COPE, he was in a wheel chair, had gone through multiple surgeries, and suffered from anxiety and depression.  (Id.)

Plaintiff receives food stamps, general assistance, and free medical services.  (TR. 382)

When Plaintiff completed the undated Activities of Daily Living Questionnaire, he was residing at a rehabilitation facility, confined to bed on doctor's orders, and was on non-weight bearing status.  (TR. 103-104) He had difficulty sitting due to recent gall bladder surgery.  (TR. 103) He was able to manage his finances and to use a telephone book.  (TR. 105) In the past, he had been able to shop for himself and he used Van Tran for transportation.  (TR. 104)

B.     Medical Evidence

      1.     Plaintiff's Physicians

           a.  Physical Impairments

At the time of the hearing Plaintiff had undergone a series of surgeries beginning in February 2003 and continuing through October 2004.  He had future surgeries planned for December 2004 and May 2005.  (TR. 365; *see also* TR. 385) During 2003 and 2004, Plaintiff was prescribed lexapro, vicodin, ms contin, oxycodone, percocet, protonix, phenergan, and morphine at various times in addition to other medications.  (*See e.g.* TR. 135, 148, 204, 214, 366, 368).

           (1.)     February 2003 shoulder surgery

On February 20, 2003, Plaintiff underwent arthroscopy, "[i]ntraarticular [sic] debridement of labral tear and long head of biceps," subacromial decompression, and rotator cuff repair for pain in his left shoulder.  (TR. 206-207) Plaintiff's surgeon, Michael A. Parseghian, M.D., placed Plaintiff in a sling for one month and ordered him to maintain strict restriction with the shoulder, which Dr. Parseghian also referred to as "immobilization."

(TR. 205-206) At Plaintiff's one month follow-up appointment, Dr. Parseghian indicated that Plaintiff was "healing well," authorized outpatient physical therapy, prescribed oxycontin, and directed that Plaintiff continue to use the sling.  (TR. 204) By April 30, 2003, Dr. Parseghian noted that Plaintiff was attending physical therapy and was "pleased with his current function" and improved pain.  (TR. 203) Dr. Parseghian denoted that Plaintiff was still weak.  (Id.)  He ordered that Plaintiff proceed to "active rehab."  (Id.)  At a May 28, 2003 appointment, Plaintiff stated that his functioning was "much improved back to a tolerable level.  He is back into light activities, light lifting but no heavy stress."  (TR. 200) Dr. Parseghian's examination revealed that Plaintiff had "essentially a full passive range of motion and active strength is much improved."  (TR. 200) His assessment was "[s]table post decompression and open cuff repair."  (Id.)

(2.)  July 1, 2003 wrist surgery

On May 16, 2003, Plaintiff was seen by Douglas A. Wegner, M.D., for problems with his left hand and wrist including pain and mild loss of motion of the ring finger.  (TR. 201) Dr. Wegner's assessment was "probably...a TFCC tear and the arthritis involving his distal radioulnar joint.  He has a volar retinacular ganglion cyst/tendinitis."  (Id.)  Dr. Wegner administered an injection.  (Id.)  At a June 11, 2003 follow-up visit, Plaintiff reported that the injection did not provide much relief.  (TR. 199) Dr. Wegner recommended elective surgery.  (Id.)  On July 1, 2003, Plaintiff underwent left wrist arthroscopy, TFCC debridement, ulnary styloid nonunion resection, ring finger cyst excision and trigger release.  (TR. 198) At a July 11, 2003 follow-up, Dr. Wegner denoted that Plaintiff's wounds were "fine" and  the plan was for Plaintiff to work on range of motion and to hold off on physical therapy for the present.  (TR. 197) Approximately six  months later, on December 24, 2003, Dr. Wegner determined that Plaintiff was "doing very well"; had good range of motion; "[n]o real tenderness, mild flexion contracture of the PIP joint of the ring finger but otherwise no problems"; could make a full fist; and had no reoccurrence of the cyst.  (TR. 188) Dr. Wegner did "not think there is going to be any reason for any further intervention."  (Id.)

<u>(3.)     October 21, 2003 bilateral ankle surgery</u>

On September 22, 2003, Plaintiff saw Ario B. Keyarash, M.D., for complaints of bilateral ankle pain.  (TR. 195-196) Plaintiff reported that since the October 2001 accident he had problems ambulating and was walking along the plantar lateral aspect of both feet which caused sores along the lateral border of the right and left midfoot and hindfoot respectively.  (TR. 195) His ankle was tender and he experienced numbness along the lateral aspect of his left leg.  (Id.)  Usually, the pain was not present upon waking but gradually increased as the day passed, was exacerbated by walking, and alleviated by rest and medications.  (Id.)  On examination, Dr. Keyarash found that Plaintiff had a fairly normal gait at a slow speed.  "Tendon examination reveals left peroneal tendon pain along the course with swelling, tenderness and decreased strength bilaterally....Neurologic examination shows decreased reflexes bilaterally about the ankle with normal pin prick and vibration sense."  (Id.)  Plaintiff had a positive Tinel sign proximally along the course of the superficial peroneal nerve.  (Id.)  X-rays showed a lateral tilt greater than 11 degrees on the left with a positive anterior drawer.  (Id.)   Dr. Keyarash's assessment was bilateral ankle pain of unknown etiology and possible superficial peroneal entrapment neuritis and neuropathy.  (TR. 196) He recommended a bone scan to rule out various possibilities.  (Id.)

On October 3, 2003, after review of the bone scan indicating no significant inflammatory process within the bilateral lower extremities, Dr. Keyarash's diagnosis was (1) superficial peroneal entrapment neuritis; (2) deep peroneal entrapment neuritis, left ankle; and (3) symptomatic exostosis of the left calcaneus.   (TR. 194) He recommended decompression of the peroneal nerves and excision of the anterior process of the calcaneal exostosis "all of which are symptomatic to him.  He is most comfortable when he is in an inverted position walking on the lateral aspect of his left foot.  I feel that is in part due to his exostosis that appears to impinge laterally on his hind foot.  In addition, this has created increased pressures and entrapment neuropathy of the left leg.  This will be addressed surgically as well."  (Id.)

- 7 -

On October 21, 2003, Dr. Keyarash performed surgery on Plaintiff's left ankle. (TR. 192) There were no complications and Plaintiff was discharged to home postoperatively with instructions to use a crutch and "no weight bearing." (TR. 192-193) At an October 31, 2003 follow-up visit, Plaintiff walked into Dr. Keyarash's office using his non-weightbearing splint. (TR. 191) Plaintiff was doing well and had no complaints other than signs of swelling which was appropriate at that stage. (Id.) Dr. Keyarash planned for Plaintiff to be placed in a short leg, non-weight bearing cast, and scheduled another appointment for two weeks when it would be determined whether Plaintiff could begin ambulation. (Id.) On November 11, 2003, Plaintiff was placed in a cast boot and permitted to begin weight bearing with gradual increase as tolerated. (TR. 190) By December 22, 2003, Plaintiff's cast had been removed while he was in jail and he had been placed in a splint. (TR. 189) Dr. Keyarash placed Plaintiff in a cast boot, noted that he was ambulating well in the cast boot, and permitted him to increase his activities. (Id.)

### (4.)  January 20, 2004 right ankle surgery

On January 20, 2004, Plaintiff had a right ankle surgery for decreased sensation over his peroneal vein and weakness of the dorsiflexion musculature of his right leg which was performed by Dr. Keyarash. (TR. 187, 326, 311-312) Thereafter, he was admitted to Waverly Park, a skilled nursing facility. (TR. 311) The January 21, 2004 Adult History & Physical report indicating Plaintiff's admission at Waverly Park denoted that Plaintiff was "unemployed and homeless living at Gospel Mission Shelter." (Id.) The impression was: right calcaneal exostosis and right peroneal nerve entrapment. (TR. 312) At Plaintiff's January 30, 2004 follow-up visit, Dr. Keyarash noted that Plaintiff was doing well and would be placed in a short leg, non-weight bearing cast. (TR. 186) By March 3, 2004, Plaintiff, who was doing well, was placed in a pre-walking boot, sent to physical therapy, and permitted to increase his activities. (TR. 184, 326) Dr. Keyarash also stated that x-rays showed "successful excision of the anterior process of the calcaneus and the calcaneonavicular exostosis with open subtalar joint." (Id.)

<u>(5.)  Abdominal impairment and February 2004 surgery</u>

A January 28, 2004 progress note from Carondelet Medical Group indicates that Plaintiff complained of a hernia, abdominal pain, and nausea.  (TR. 306)  On physical examination Plaintiff belched repetitively.  (Id.)  The assessment was abdominal pain and nausea.  (Id.)  Further testing was ordered.  (Id.)

On February 12, 2004, Plaintiff, whose right foot was in a cast, presented at St. Mary's Hospital complaining of chronic diarrhea, inability to eat or keep food down, belching and reflux.  (TR. 180) Plaintiff reported that medications for reflux such as nexium, prilosec, zantac and pepcid did not help.  (Id.)  Physical examination showed Plaintiff to be well-nourished and well-developed.  (Id.)  He had an umbilical hernia and admitting Dr. Robert Northcutt's impression was "[r]eflux esophagitis with probably erosive esophagitis..." (TR. 181) Dr. Northcutt ordered further testing.  (Id.; *see also* (TR. 169-170 Dr. Jay Park also ordered further testing on February 13, 2004)) February 13, 2004 test results denoted elevated liver function. (TR. 170) On February 14, 2004, Plaintiff was examined by James Dinning, M.D., who saw no evidence of pancreatitis. (TR. 166-167)  "Also he has severe esophagitis by report, by his description, seems to be a mild esophagitis with merely a single erosion.  The patient is here after he was expelled from his rehab.[6]  His elevated liver tests are improving suggesting acute injury and with the pancreatitis I am slightly suspicious of alcohol despite his claim not to drink at all."  (TR. 167) Dr. Dinning also pointed out that despite Plaintiff's symptoms, he had not experienced weight loss since the onset of his symptoms. (TR. 166)  Dr. Dinning ordered further testing.  (TR. 167)  He also noted that Plaintiff had an umbilical hernia for which a surgical evaluation was prudent.  (Id.)

On February 15, 2004, Dr. Dinning's impression after an EDG and colonoscopy with biopsy was moderate hiatal hernia, good bile drainage, otherwise normal upper endoscopy

---

[6]Prior to presenting at St. Mary's Hospital, Plaintiff had been at Waverly Park for rehabilitative care subsequent to surgery on his right ankle.  (*See* TR. 180)

to the small bowel, three "mm sessile ascending colon polyp with cold biopsy removal, large internal hemorrhoids. (TR. 165) Dr. Dinning's recommendations included protonix, simethicone, sitz baths, tucks pads, small-bowel follow through, and additional testing. (Id.) A February 16, 2004 detailed small bowel study was within normal limits. (TR. 163) A February 18, 2004 CT scan of the abdomen showed a small periumbilical hernia. (TR. 162) Additionally, a February 19, 2004 HIDA scan and sonography showed that Plaintiff's gallbladder was normal and unremarkable. (TR. 158, 161; *see also* (TR. 154-155 (February 23, 2004 oral cholecystrogram was negative with regard to gallbladder)) A February 19, 2004 consult record by Eric Kendle, M.D., denoted that Plaintiff had "[m]ultiple issues....He may well benefit from an umbilical hernia repair that would relieve some of the discomfort in his abdomen. I doubt this has anything to do with his reflux symptoms or his elevated amylase and lipase." (TR. 159-160)

On February 25, 2004, Plaintiff underwent umbilical hernia repair, laparoscopic cholecystectomy, intraoperative cholangiogram, and exploratory laparoscopy. (TR. 149) The laparoscopic exploration did not show "'visceral' abnormalities related to [Plaintiff's] trauma two years ago." (Id.) On February 27, 2004, Plaintiff was discharged to a "skilled nursing facility mainly because he is nonweightbearing [sic] on the right foot, due to followup with his orthopedic surgeon in early March...." (TR. 148) Plaintiff's discharge diagnoses were (1) chronic cholecystitis with possible biliary dyskinesia; (2) elevated liver function tests presumed secondary to #1; (3) ventral hernia; (4) depression; (5) status post several lower extremity surgeries, most recently the right foot; and (6) hiatal hernia with possible reflux disease. (TR. 147) Douglas Bischoff, M.D., the discharging doctor, indicated that "[p]ostoperatively the patient has had a reduction in his tendency to belch and vomit, still complains of dysphagia, however. His symptoms could in large part be related to the hiatal hernia, which has failed all medical trials including several different proton pump inhibitors." (TR. 148) Upon admission to Sabino Canyon Healthcare Center, the skilled nursing facility, Plaintiff was "in nonweightbearing [sic] on the right lower extremity with his right lower leg

- 10 -

in a cast." (TR. 368)[7]   The impression was status post laparoscopic abdominal surgery, fairly recent orthopedic procedures, rather significant GERD, and depression. (TR. 369) On March 26, 2004, Plaintiff was discharged from Sabino Canyon Healthcare Center with directions to follow up with his primary care provider in one to two weeks. (TR. 370)[8] He was also given a list of housing resources. (Id.) On discharge, Plaintiff's rehabilitation potential was "good." (TR. 371)

On April 11, 2004, Plaintiff presented at the hospital emergency room complaining of belching, vomiting, and difficulty swallowing. (TR. 211) An esophageal manometry study was "consistent with ineffective esophageal motility disorder." (TR. 218)

On May 10, 2004, Plaintiff presented at the hospital emergency room complaining of difficulty eating and that he has only been able to eat pasta for the last 12 weeks. (TR. 224) "He is belching all the time. Whenever he eats it is 'like rocks going down.' He states when he eats he either has diarrhea or vomiting. He has been losing weight." (Id.) The diagnosis was reflux esophagitis and reactive depression. (TR. 225) He was directed to follow up with gastroenterology. (Id.)

<u>(6). October 26, 2004 bilateral ankle and foot surgery</u>

Records from Dr. Keyarash indicate that Plaintiff had bilateral ankle and foot surgery on October 26, 2004. (TR. 322-323) No further specifics about the surgery are given. (Id.) Notes from a November 19, 2004 follow-up appointment reflect that Plaintiff was taken out of his cast. (TR. 323) X-rays showed "a well resected osteophytes [sic] from the talonavicular joint." (Id.) Dr. Keyarash recommended that Plaintiff "increase his activities,

_____

[7]The February 28, 2004 Adult History and Physical report indicating Plaintiff's admission to Sabino Canyon Healthcare Center was submitted to the Appeals Council subsequent to the ALJ's decision. (TR. 4; *see also* Plaintiff's Statement of Facts (hereinafter "PSOF"), p.9)

[8]The March 26, 2004 Discharge Summary was submitted to the Appeals Council subsequent to the ALJ's decision. (TR. 4; *see also* PSOF, p.9)

go into his shoes and begin ambulating." (Id.) Dr. Keyarash anticipated discharging Plaintiff from his care in six weeks if Plaintiff was doing well at that time. (Id)

At a January 7, 2005, follow-up appointment, Plaintiff reported "that most of the symptomology is gone" but he complained of ingrown toenails and fungal infections for which Dr. Keyarash referred Plaintiff to Dr. Evans. (TR. 322) Dr. Keyarash's physical examination with regard to the October 2004 surgery reflected that Plaintiff ambulated with a fairly normal gait at slow speed and he continued to have some swelling of his left ankle. (Id.) Dr. Keyarash discharged Plaintiff "from care in terms of his surgeries with us." (Id.)

(7.)   Additional Medical evidence submitted to the Appeals Council

After the ALJ entered his decision, Plaintiff submitted additional medical evidence to the Appeals Council. (*See* TR. 3; PSOF, pp. 9-10) Some of that evidence has been discussed under the appropriate heading above. Records unrelated to the above-discussed conditions follow.

On May 16, 2005, Plaintiff sought medical treatment for injuries he sustained in a bicycle accident the previous day. (TR. 25) His face, shoulder and wrist were sore. (Id.) A May 16, 2005 x-ray of Plaintiff's right shoulder was negative. (TR. 36) When Plaintiff returned for a follow-up visit on May 31, 2005, the assessment was shoulder pain, lower back pain, facial contusions. (TR. 38) Vicodin and physical therapy were prescribed. (Id.)

On June 21, 2005, Plaintiff returned complaining of shoulder pain. (TR. 38) Rotator cuff injury was suspected. (Id.) He was prescribed vicodin and referred to Tucson Orthopedic Institute. (Id.)

b.  Mental Impairment

On December 3, 2003, Plaintiff presented at COPE seeking mental health services. (TR. 232) He stated he was separating from a relationship with a woman he described as mentally ill; had been arrested 19 times for interfering with judicial proceedings regarding his attempts to see his daughter; was homeless and unemployed since January 2002; was

living at a shelter; and had undergone multiple surgeries every 12 weeks since 2003.  (Id.)

He said he had additional surgeries scheduled; complained that it hurt to move and was

experiencing pain equal to a 9 on a scale of 1 to 10; and he was wearing a brace on his left

leg and foot. (Id., TR. 233-234 ) He had used cocaine in the 1980's and last used alcohol and

marijuana one year previous.  (TR. 244) He felt anxious, irritable and depressed, had trouble

concentrating, and did not feel he could manage any longer.  (Id., TR. 233)  Melisa Sonier,

CMA, indicated upon intake that Plaintiff's affect was "flat/blunt, speech was soft spoken

and tangential, and [he] presented with limited insight/judgement, and poor concentration."

(TR. 232)  His Global Assessment of Functioning score (hereinafter "GAF") was 56.  (Id.)

Moderate depression was also indicated.  (Id.)

At a January 20, 2004 appointment at COPE, Plaintiff indicated that during the last

three years he had developed increased anger.  (TR. 229) His sleep was poor and his mood

was irritable. (Id.) The provider, whose name is illegible, indicated that Plaintiff contradicted

himself multiple times and was a "poor historian...grandiose."  (Id.)  His GAF was 45.  (Id.)

Assessment was adjustment disorder with depressed mood and personality disorder.  (Id.)

Plaintiff was prescribed lexapro.  (Id.)

March 19, 2004 COPE records reflected Plaintiff's report that the lexapro helped "but

he still gets very angry at people." (TR. 252)  His GAF was 45.  (Id.)  In May 2004, Plaintiff

reported that the lexapro was working well.  (TR. 250) He maintained contact with COPE

and continued on lexapro throughout 2004.  (*see* TR. 269-296) In October 2004, he reported

to COPE that he was attending school and the lexapro helped "keep him non-stressed."  (TR.

288) A December 16, 2004 COPE physician service note denoted that Plaintiff  recently had

surgery on his left ankle and that he appeared alert, active, appropriate, in no distress, well

groomed and his "concentration, cognition, and memory" were within normal limits.  (TR.

275) His GAF was 70.  (TR. Id.)  Plaintiff's December 20, 2004 Annual Behavioral Health

Update and Review with COPE reflected that Plaintiff found lexapro "to be very helpful in

addressing symptoms associated with [his] psychiatric diagnosis."  (TR. 269) Plaintiff

reported that he was attending a community college nursing program, hoped to transfer to the university in 2005, and that he was "not currently working and...[did] not have a desire to return to work and thus vocational programs are not currently necessary." (Id.) The assessor indicated that Plaintiff "overall engages in productive and functional daily activities and states..." he is pleased with his activities. (Id) Plaintiff's GAF was 56. (TR. 270) A January 14, 2005 COPE note indicated that Plaintiff was scheduled to have his last surgery on his esophagus in the summer, was continuing on lexapro, and "seem[ed] stable." (TR. 268)

2.      State-Agency Non-Examining Physician

On June 7, 2004, Paul Tangeman, Ph.D., completed a Psychiatric Review Technique wherein he indicated that Plaintiff suffered from adjustment disorder and personality disorders. (TR. 254, 257) He opined that the impairments were severe but not expected to last 12 months. (TR. 254, 264) He projected that by December 2004 Plaintiff's impairments would cause only a mild degree of limitation with regard to activities of daily living, social functioning, concentration and persistence. (Id.)

C.      Lay Testimony

On March 7, 2004, Ms. Ivette Cambridge, who identified herself as a friend of Plaintiff's during the past nine years, completed a Function Report regarding Plaintiff.[9] (TR. 107) At that time, Plaintiff was on non-weight bearing status, attending physical therapy once a week, had recently had his gallbladder removed, and was limited to bed rest on doctor's orders. (Id.) She indicated that Plaintiff had difficulty lifting, sitting, stair-climbing, squatting, kneeling, bending, talking, using hands, standing, completing tasks, reaching, walking, and dressing. (TR. 108, 112) When asked about Plaintiff's hobbies and interests, Ms. Cambridge wrote: "all of my [sic] outdoor activities has [sic] changed due to L & R foot being operated on am [sic] in rehabilitative state of recovery too [sic] last indefinately [sic]."

---

[9]It appears that Ms. Cambridge is Plaintiff's ex-wife. (*See* TR. 318 (Plaintiff identified Ivette Cambridge as his spouse in December 2003))

(TR. 111) Elsewhere in the questionnaire, she stated that it took Plaintiff up to 40 minutes to prepare his special diet for swallowing problems, however, it was difficult for him to stand while preparing meals due to his feet and leg operations.  (TR. 109) Plaintiff  had no difficulty caring for his hair, using an electric razor, or using the toilet, was able to follow written and spoken instructions, was aware of his surroundings, used public transportation (bus or Van Tran), shopped in stores once per week for forty minutes, was able to pay his bills and count change, and he got along well with his friends and family.  (TR. 108, 110-112) Plaintiff's social activities primarily involved attending weekly stress management classes required by his COPE case manager.  (TR. 111)

### D.      The ALJ's Findings

#### 1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments.  20 CFR §§ 404.1520(c)), 416.920(c)).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id.*  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled

and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[10] to perform past work.  20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.  *Id.* However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

2.      The ALJ's Decision

In his March 15, 2005 Decision, the ALJ made the following findings:

1.      The claimant met the disability insured status requirements of the Act on March 15, 2003, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

---

[10]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset date.

3.  The claimant's impairments which are considered to be "severe" within the meaning of the Social Security Act and Regulations are: esophageal motility disorder; and status post multiple surgeries of the ankles, left shoulder, and left wrist. He does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 CFR 404, Subpart P, and Appendix 1.

4.  Although the claimant has underlying medically determinable impairments that could reasonably cause the symptoms that he has alleged, the claimant's allegations as to his subjective symptoms and associated limitations are not fully credible for the reasons described more fully above [in the body of the ALJ's decision].

5.  The claimant has the residual functional capacity to perform light work-related activities except for working around hazards such as moving machinery and at unprotected heights (20 CFR 404.1545 and 416.945).

6.  The claimant's past relevant work as a respiratory care therapist did not require the performance of work-related activities precluded by the above limitation(s) (20 CFR 404.1565 and 416.965)

7.  The claimant's impairments do not prevent the claimant from performing his past relevant work as a respiratory care therapist.

8.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e) and 416.920(e)).

## DECISION

It is the decision of the Administrative Law Judge that, based upon the applications filed on December 15, 2003, the claimant is not entitled to a period of disability or disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act, and is not eligible for supplemental security income under sections 1602 and 1614(a)(3)(A) of the Act.

(TR. 54-55)

In reaching his decision regarding Plaintiff's physical impairments, the ALJ gave substantial weight to the records of the treating physicians. (TR. 53) The ALJ found that "[t]he treatment records support the conclusion that [Plaintiff] could perform at least light work activity except for short periods of time when he was recovering from surgery." (TR.

52 (citing TR. 183-210, 211-214, 223-227, 321-326))[11] He also stated that "[t]he record documents occasional short periods of non-weight bearing.  Considered cumulatively, these periods would likely have limited the claimant to no more than light work activity."  (Id.) He also noted "that none of [Plaintiff's] treating physicians have provided specific activity restrictions to the claimant."  (Id.)

The ALJ gave substantial weight to the Disability Determination Service Physicians concerning Plaintiff's psychological impairment and determined that Plaintiff's mental health impairment was found to be severe but was not expected to last the requisite 12 months.  (Id.) (citing TR. 254-266) The ALJ pointed out that Plaintiff did not seek mental health treatment until December 2003, improved with medication, and by October 2004 he was attending school, earning very good grades, and his GAF was rated at 70 "indicative of some mild symptoms...His level of intellectual activity, full time school attendance, and lack of psychological symptoms with medication are consistent with a non-severe impairment." (Id.)

The ALJ also determined that Plaintiff's testimony concerning the severity and functional consequences of his symptoms was not fully credible.  (Id.)

The ALJ found that Plaintiff "retains the ability to lift and carry 20 pounds occasionally and 10 pounds frequently.  He is able to sit, stand, and/or walk for about six hours in an 8-hour work day with normal breaks.  He should avoid working around hazards such as a [sic] moving machinery and at unprotected heights but has no other exertional or non-exertional limitations."  (TR. 54)

When affirming the ALJ's decision, the Appeals Council determined that Plaintiff's additional evidence submitted subsequent to the ALJ's decision either did not provide a basis for changing that decision or was dated after the ALJ decided Plaintiff's case and, thus, did

---

[11]The treatment records cited by the ALJ concerned Plaintiff's bilateral ankle surgeries, shoulder surgery, wrist surgery, and complaints concerning his abdominal area. The ALJ did not cite medical records documenting Plaintiff's abdominal surgery in February 2004.  (*See* TR. 147-182)

- 18 -

not affect the ALJ's "decision about whether you were disabled beginning on or before March 15, 2003." (TR. 6)

III.   ARGUMENT

Plaintiff contends that ALJ erred because Plaintiff "could not possibly hold competitive employment with the number of surgeries and required convalescence post-surgery." (Plaintiff's MSJ, p. 5); the ALJ improperly discredited Plaintiff's testimony; and failed to give specific reasons for rejecting Plaintiff's lay testimony.

Defendant argues that the ALJ cited evidence supporting the conclusion that Plaintiff was able to function shortly after each of the surgeries.  Defendant also argues that there was no error in rejecting Plaintiff's credibility.  Nor did the ALJ err in failing to address Ms. Cambridge's statement because she merely confirmed that Plaintiff had undergone multiple surgeries.  Defendant further asserts that any error regarding Ms. Cambridge's statement is harmless.

IV.   STANDARD OF REVIEW

An individual is entitled to Title II Social Security Disability Insurance benefits (hereinafter "SSDIB") if the individual is insured for those benefits, has not attained retainment age, has applied for those benefits, and is disabled.  42 U.S.C. § 423(a)(1).  An individual is entitled to Title XVI Supplemental Security Income disability benefits (hereinafter "SSI") if the individual is disabled and meets certain eligibility requirements.  42 U.S.C. § 1381(a).  The definition of "disability" for SSDIB and SSI purposes is the same: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the

- 19 -

national economy.'" *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on

either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or nonexamining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

V.      DISCUSSION

     A.      Plaintiff's ability to perform his past work as a respiratory care therapist

The ALJ found that Plaintiff "retains the ability to lift and carry 20 pounds occasionally and 10 pounds frequently. He is able to sit, stand, and/or walk for about six hours in an 8-hour day with normal breaks. He should avoid working around...moving machinery and at unprotected heights but has no other exertional or non-exertional limitations." (TR. 54) Therefore, the ALJ concluded that Plaintiff could "perform light[12]

---

[12]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 CFR §§ 404.1567(b), 416.967(b).

work-related activities except for working around hazards such as moving machinery and at unprotected heights." (TR. 55) The ALJ further found that Plaintiff's past relevant work as a respiratory care therapist, as described by Plaintiff, was not precluded by the identified limitations and thus Plaintiff could perform such work. (TR. 54-55)

Plaintiff argues that he "could not possibly hold competitive employment with the number of surgeries and required convalescence post surgery." (Plaintiff's MSJ, p. 5)

"The critical issue in a disability case is the claimant's 'capacity for work activity on a *regular and continuing basis.*'" *Irwin v. Shalala,* 840 F.Supp. 751, 763 (D. Or. 1993) *(quoting* 20 CFR § 404.1545(b)) (emphasis in original). Thus, "[w]here it is established that the claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity." *Gatliff v. Comm'r. of Soc. Sec.,* 172 F.3d 690, 694 (9th Cir. 1999) (no substantial gainful employment where plaintiff is unable to hold a job for more than 2 months at a time). "Occasional symptom-free periods–and even the sporadic ability to work–are not inconsistent with disability." *Lester v. Chater,* 81 F.3d 821, 833 (9th Cir. 1995).

Plaintiff's past work as a respiratory care therapist required walking and standing for six hours each day; no time sitting; reaching, writing, typing, or handling small objects for 12 hours; lifting and carrying a machine; lifting up to 10 pounds frequently; and also lifting up to 20 pounds at times. (TR. 96) The ALJ acknowledged that Plaintiff could not perform light work activity during "short periods of time when [Plaintiff] was recovering from surgery." (TR. 52) The ALJ also stated that "[t]he record documents short periods of non-weight bearing. Considered cumulatively, these periods would likely have limited the claimant to no more than light work activity." (TR. 53) Plaintiff was on non-weight bearing status while recovering from surgery on his ankles. (TR. 193, 186, 148; *see also* TR. 322-323 (indicating Plaintiff was in a cast following bilateral ankle and foot surgery))

The record reflects that Plaintiff first sought treatment for problems related to standing and walking in September 2003. (TR. 195-196) He told Dr. Keyarash that he had

experienced such difficulty since the October 2001 automobile accident.  (Id.)  Plaintiff's problems associated with walking and standing are confirmed by Dr. Keyarash's findings, surgery recommendation and ultimately the series of bilateral ankle surgeries.  Defendant correctly points out that Plaintiff consistently did well after the surgeries.  However, Plaintiff's good recovery does not vitiate the fact that he was on non-weight bearing status post surgery or that he spent time in skilled nursing facilities on two different occasions subsequent to various surgeries.

Light work requires "a good deal of walking or standing..."  20 CFR §§ 404.1567(b), 416.967(b).  Specifically, Plaintiff's past work required walking and standing up to 6 hours each day.  (TR. 96) Consequently, the evidence of record does not support the ALJ's finding that "cumulatively" Plaintiff's periods of restriction to non-weight bearing status "would likely have limited [him] to no more than light work activity."  (TR. 53) Such a finding is also contradicted by the ALJ's earlier statement that Plaintiff could not perform light work activity while he was recovering from surgery.  (TR. 52)

The ALJ's decision may still be upheld if, notwithstanding Plaintiff's periods of recovery and/or non-weight bearing status, Plaintiff could nonetheless perform his past work as a respiratory care therapist "on a regular and continuing basis" when considering the record as a whole.  20 CFR §§ 404.1545(b), (c),  416.945(b),(c).

The ALJ determined that Plaintiff suffered from the following severe impairments "esophageal motility disorder; and status post multiple surgeries of ankles, left shoulder, and left wrist."  (TR. 54) The ALJ found that Plaintiff "could perform at least light work activity except for short periods of time when he was recovery from surgery."  (TR. 52) The record is lacking as to how the ALJ calculated the duration of each post operative period of recovery which he characterized as "short...."  (TR. 52)

Plaintiff underwent surgery on his left shoulder including rotator cuff repair on February 20, 2003.  (TR. 206-207) Thereafter, he was ordered to keep the shoulder immobile and he wore a sling. (TR. 205) Within three months (May 28, 2003), Plaintiff's shoulder

function was "much improved" and he was "back into light activities, light lifting but no heavy stress." (TR. 200). Plaintiff's past work required him to lift and carry a machine and to frequently lift 10 pounds and, at times, 20 pounds. (TR. 96)

On July 1, 2003, less than two months post shoulder surgery, Plaintiff, who is right-handed, had left wrist surgery. (TR. 198, 378) At a July 11, 2003 appointment, Dr. Wegner decided to hold off on physical therapy for the present. (TR. 197)

On September 22, 2003, Plaintiff saw Dr. Keyarash concerning ankle pain . (TR. 195-196) On October 21, 2003, approximately 4 and one-half months after his shoulder surgery and two and one-half months after wrist surgery, Dr. Keyarash performed the first in a series of bilateral ankle surgeries, this time on Plaintiff's left ankle. (TR. 192) Plaintiff was on non-weight bearing status until November 20, 2003 when Dr. Keyarash placed him in a cast boot and directed him to begin weight bearing with gradual increase as tolerated. (TR. 190) By December 22, 2003, Plaintiff was ambulating well, wearing a cast boot, and permitted to increase activities. (TR. 189)

In December 2003 and January 2004, Plaintiff was diagnosed with adjustment disorder with depressed mood and personality disorder, had a GAF score of 45 indicating "serious symptoms...or serious impairment", and began taking lexapro. (TR. 229, 232, 252); *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1995) (defining GAF).

On January 20, 2004, approximately one month after the first ankle surgery, Dr. Keyarash performed surgery on Plaintiff's right ankle. (TR. 311-312) Plaintiff was released to a skilled nursing facility. (Id.) Although the precise date of Plaintiff's release from the nursing facility is not apparent in the record, a February 14, 2004 hospital record indicates he had been released by that date. (TR. 166 ("On his discharge from rehab, the patient came to St. Mary's E.R....")) Plaintiff remained on non-weight bearing status until at least March 3, 2004 when he was placed in a pre-walking boot, referred to physical therapy, and permitted to increase his activities. (TR. 184, 326; *see also* TR. 148 (denoting that Plaintiff was on non-weight bearing status as of February 27, 2004))

While Plaintiff was recovering from surgery on his right ankle, Plaintiff underwent abdominal surgery on February 25, 2004.  Thereafter, he was discharged to a skilled nursing facility where he remained until March 26, 2004.  (TR. 148-149, 368) Plaintiff was admitted to the skilled nursing facility "mainly because he is nonweightbearing [sic] on the right foot, due to followup with his orthopedic surgeon in early March...."  (TR. 148)

In March of 2004, Plaintiff was taking lexapro for psychological problems and his GAF score remained at 45.   (TR. 252) In June 2004, non-examining state agency psychologist Dr. Tangeman opined that Plaintiff suffered from adjustment disorder and personality disorder which were severe but not expected to last twelve months and should be non-severe by December 2004. (TR. 254, 257, 264) In assessing Plaintiff's psychological impairment, the ALJ stated the evidence of record was insufficient to establish a mental impairment prior to December 2003 when Plaintiff first sought treatment.  (TR. 53) "By October 2004, the claimant was attending school, and earning very good grades.  His global assessment of functioning was rated at 70, indicative of some mild symptoms...His level of intellectual activities, full time school attendance and lack of psychological symptoms with medication are consistent with a non-severe impairment." (TR. 53-54) The record supports the ALJ's conclusion that Plaintiff's psychological impairment was non-severe by the fall of 2004.  (*See also* TR. 275, 270[13])

In September 2004, Plaintiff began attending nursing classes at a community college. Special accommodation was made so he would not have to traverse the campus to attend his classes.

---

[13]A December 20, 2004 COPE report indicated that Plaintiff's GAF score was lowered to 56 (indicating some moderate symptoms) and that Plaintiff was engaged in productive and functional daily activities.  (TR. 270)

On October 26, 2004, Plaintiff underwent additional bilateral ankle and foot surgery.[14] (TR. 322-323) One month later, Dr. Keyarash recommended that Plaintiff "increase his activities, go into his shoes and begin ambulating.  I will see him back here in about six weeks for reevaluation.  If he is doing well we will discharge him from care at that time." (TR. 233)

On January 7, 2005, Dr. Keyarash discharged Plaintiff "from care in terms of his surgeries with us." (TR. 322) Dr. Keyarash also referred Plaintiff to another doctor regarding Plaintiff's complaints of ingrown toenails and fungal infection.  (Id.)

Defendant argues that Plaintiff failed to cite evidence "proving he was unable to perform any work activity for more than a short time after each surgery."  (Defendant's XMSJ, p.4) Defendant's argument concedes the point that Plaintiff was unable to perform work activity for some period, characterized by Defendant as a "short" period, after each surgery.  Further, "substantial gainful activity means more than merely the ability to find a job and physically perform it; it also requires the ability to hold the job for a significant period of time."  *Gatliff,* 172 F.3d at 694 (holding that the inability to work for more than two months at a time is presumptively insufficient to establish substantial gainful activity).  Thus, Defendant's position that Plaintiff may have been able to work between periods of recovery does not result in a nondisability finding if Plaintiff could not hold that job for a significant period of time due to continuing surgeries and recovery periods.

The record supports the ALJ's conclusion that Plaintiff was unable to perform his past work while he was recovering from multiple surgeries.  (TR. 52) However, the ALJ did not consider the impact that each individual recovery period, including time Plaintiff spent in skilled nursing facilities, had on Plaintiff's capacity for work activity on a regular and continuing basis.  Instead, the ALJ considered Plaintiff's "occasional short periods of non-

---

[14]The record suggests that the surgery was on Plaintiff's left ankle.  (*See* TR. 322 (January 7, 2005 follow-up note indicating that Plaintiff "continues to have some swelling of his left ankle."))

weight bearing status...cumulatively...." (TR. 53) Consequently, the ALJ's analysis fails to consider the actual and practical impact that each separate recovery period had on Plaintiff's capacity to work for a significant period.

B.      Time period at issue

One of the difficulties in reviewing the ALJ's decision herein concerns the fact that the record indicates more than one alleged onset date.  In his December 15, 2003 Applications for SSI and SSDIB, Plaintiff stated that he became unable to work because of his disabling condition on March 15, 2003.  (TR. 90, 345) Plaintiff's Work History form indicates that he stopped working as a respiratory care practitioner in September 2002.  (TR. 95). His Disability Report contains statements that his injuries first bothered him on March 1, 2003 and he became unable to work on March 15, 2003. (TR. 98) and that he stopped working on June 15, 2002 because he was "compromising my physical abilities."  (TR. 99) Plaintiff testified that unless he was mistaken, he last worked in July of 2002 but he "may be wrong." (TR. 379) Plaintiff states in his Reply filed with this Court that he has been disabled since June 15, 2002.  (Plaintiff's Reply,  p.2)

Without discussing the discrepancies of record concerning when Plaintiff alleges his disability commenced, the ALJ stated that Plaintiff applied for benefits "alleging disability since March 15, 2003 due to multiple surgeries." (TR. 48) With specific regard to Plaintiff's psychological impairment, the ALJ agreed with "the Disability Determination Service physicians...that there was insufficient evidence to establish any medically determinable impairment" before December 2003.  (TR. 53)

Generally, onset date may only become an issue if disability is found in the first instance.  However, the date Plaintiff herein claims he was unable to work due to his injuries may be relevant in determining whether he is disabled at all.   Plaintiff's December 2003 applications for benefits indicate he was unable to work because of the surgeries as of March 15, 2003.  Other forms completed by Plaintiff together with his testimony suggest that Plaintiff is also alleging that he became unable to work because of his injuries sometime

between June and September 2002. (TR. 95, 99, 379) In sum, Plaintiff claims he stopped working sometime in 2002 because injuries, which he associated with a 2001 automobile accident, made it impossible for him to continue working as a respiratory care therapist or to work at all, thus rendering him disabled under the Social Security Act.

The ALJ, albeit relying on one of Plaintiff's alleged onset dates of March 15, 2003, considered whether Plaintiff was disabled since that date. Implicit in the ALJ's finding that Plaintiff's surgeries and recovery periods beginning March 2003 did not render him disabled is the conclusion that Plaintiff could perform his past work prior to March 15, 2003. However, when the ALJ made his determination, and at this point as well, the record is unclear not only as to whether Plaintiff's impairments are disabling but also as to the appropriate time period at issue.

The record reflects no medical evidence contemporaneous with the 2001 automobile accident or 2002 when Plaintiff last worked. Plaintiff states that he did not have insurance to seek medical treatment. (Plaintiff's Reply, p.2) The record contains medical evidence contemporaneous with March 15, 2003, which is one of Plaintiff's alleged onset dates. However, the 2003 records from Dr. Parseghian and Dr. Keyarash also reflect Plaintiff's reports that his impairments were related to the automobile accident. Both doctors concluded that Plaintiff required surgery. 2004 COPE records also denote that Plaintiff related his psychological impairment to the pain and surgeries.[15]   Additionally, Plaintiff related his

_____

[15]The ALJ determined that Plaintiff's claim of mental impairment was not disabling given that it was not expected to last for one year. Generally, "two separate disability causes ordinarily cannot be tacked to equal 12 months." *Ratto v. Secretary,* 839 F.Supp. 1415, 1427 (D.Or. 1993) (*citing* 20 CFR 404.1522(a)). However, "a different rule applies where the first disability is related to the second. Where an emerging mental impairment overlaps in time with a triggering but diminishing physical impairment, the combined effect of the impairments should be considered to the extent it might bear on the onset date of disability." *Id.* (*citing Lichter v. Bowen,* 814 F.2d 430, 436 (7th Cir. 1987)). Moreover, "even if the two conditions are unrelated, the impairments may combine to created [sic] a continuous period of disability so long as the duration of each impairment, taken separately, lasted or was expected to last 12 months, and the initial onset of disability was before the insured status

- 28 -

abdominal problems, which required surgery in 2004, to the automobile accident.  Thus, the record clearly supports the conclusion that Plaintiff had impairments regarding his shoulder, ankles, and abdominal/esophageal area that required surgery to repair.  The record suggests that the relevant period for examination may have commenced much earlier, i.e. sometime between June and September 2002.  Consequently, the issue may not be as narrow as whether Plaintiff's surgeries prevented him from working as much as whether Plaintiff's injuries alone and/or in combination with the surgeries and resultant recovery periods affected his capacity to work as well.  This question, a difficult one given the lack of medical records, was not addressed. *See e.g.* SSR 83-20 (where medical evidence is not evident concerning the onset date, the ALJ may call upon the services of a medical advisor).

C.      Lay Testimony

Plaintiff contends that the ALJ's failure to discuss Ms. Cambridge's "Function Report" constituted error.  Defendant posits that the ALJ was not required to address Ms. Cambridge's statement to the extent her opinion was beyond the competence of a lay witness. Defendant also argues that any error is harmless.

Defendant is correct that lay testimony making a medical diagnosis or vocational assessment is "beyond the competence of lay witnesses and do[es] not constitute competent evidence" requiring consideration by the ALJ.  *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996) (*citing Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir. 1984)).  However, "[l]ay testimony as to a claimant's *symptoms* is competent evidence which the [ALJ] must take into account...unless he expressly determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'"  *Id.* (*quoting Dodrill v. Shalala,* 12 F.3d 915, 919 (1993)) (emphasis in original).  Ms. Cambridge's statement included information about Plaintiff's symptoms which the ALJ did not address as required.

_____

date."  *Id.*

D.    Plaintiff's Credibility

The ALJ "concluded that...[Plaintiff's] testimony with regard to the severity and functional consequences of his symptoms is not fully credible."  (TR. 53) The ALJ cited "[t]he objective medical evidence", "inconsistencies contained" in Plaintiff's statements, the "large gap of time...before [Plaintiff] sought treatment seeking relief from that pain", statements from medical providers, and that Plaintiff did not experience weight loss or muscle atrophy.  (TR. 52-53)

Plaintiff argues that the ALJ erroneously considered the time gap between the onset of symptoms and treatment.  Plaintiff also argues that the ALJ's reference to inconsistent statements is unsupported by the record and are of no moment given that "causation is not even an issue."  (Plaintiff's Reply, p.2)

Where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing.  *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006).  Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn v. Astrue,*  __ F.3d __, 2007 WL 2034287 (9th Cir. July 16, 2007) (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Id.* at 1284. *See also Robbins,* 466 F.3d at 884 ("To find the claimant not

credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or internal contradictions in that testimony.")

### 1.    Time Gap

"In some circumstances, a failure to seek treatment or a failure to follow a prescribed treatment is properly used as evidence supporting a conclusion that the claimant is not credible in describing his or her symptoms." *Orn*, __ F.3d __, 2007 WL 2034287 (9th Cir. July 16, 2007). However, "'[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds.'" *Id.* (*quoting Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir. 1995)). Thus, the Ninth Circuit has "proscribed the rejection of a claimant's complaints for lack of treatment when the medical record establishes that the claimant could not afford it." *Regenniter v. Comm'r.*, 166 F.3d 1294, 1297 (9th Cir. 1999).

Plaintiff asserts that "[i]t wasn't until he was able to qualify for state assistance including healthcare that he was able to finally undergo medical treatment." (Plaintiff's MSJ, p. 6) Defendant argues that "nothing in the record...supports this contention."[16] (Defendant's XMSJ, p. 5)

Plaintiff testified before the ALJ that he did not pursue medical treatment until approximately two years after the October 2001 automobile accident because "I was not

---

[16]Defendant also states that "Plaintiff was even able to receive medical treatment during a period that he was serving time in jail." (XMSJ, p. 6 (citing TR. 189)) Defendant's reference to Dr. Keyarash's December 22, 2003 treatment record indicating the removal of a cast and placement of a splint while Plaintiff was in jail post-surgery during an undetermined period of time between October 31, 2003 and November 20, 2003 offers nothing to support the conclusion that Plaintiff could have afforded to pay for medical treatment. (TR. 189-191) Moreover, the fact that Dr. Keyarash removed the splint, which is described as "a floppy posterior shell", and placed Plaintiff back in a cast boot suggests that the removal of the cast in jail was not the course of treatment that Plaintiff's treating physician found appropriate. (TR. 189-190)

insured at the time and I had no health insurance as well." (TR. 379; *see also* TR. 387 (Plaintiff's testimony that he went without medical treatment after the accident because he "didn't have the funds.")) He also testified that as of the time of the hearing, he was receiving free medical services, general assistance, and food stamps. (TR. 382) Additionally, Dr. Parseghian's January 27, 2003 treatment note reflects Plaintiff's report of intolerable shoulder pain since the October 2001 accident, he was previously examined by "Dr. Abbott and apparently was uninsured at the time", and "[n]ow he has insurance authorization...." (TR. 209)

The ALJ "'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record that may explain infrequent or irregular medical visits or failure to seek medical treatment' including inability to pay...." *Id.* (*quoting* SSR 96-7p). The ALJ herein "did not suggest that [Plaintiff's] proffered reason was not believable." *Id.* (*citing Gamble*, 68 F.3d at 321). The record supports the conclusion that Plaintiff did not seek medical treatment during the time when he was unable to afford it; but he sought treatment for his symptoms when he obtained funding for such treatment. Under such circumstances, the Ninth Circuit has held that the plaintiff's "failure to receive medical treatment during the period that he had no medical insurance cannot support an adverse credibility finding." *Id.* (adverse credibility finding unsupported where the plaintiff "did not see physicians during the time he could not afford medical treatment and...sought treatment for his symptoms when he was able to go to the doctor.") Consequently, Plaintiff is correct that the adverse credibility finding herein is unsupported to the extent that the ALJ cited the "large gap of time...before [Plaintiff] sought treatment." (TR. 52); *See Orn*, __ F.3d __, 2007 WL 2034287 (9th Cir. July 16, 2007).

### 2.    Inconsistent Statements

The ALJ also discounted Plaintiff's credibility due to inconsistent statements by Plaintiff regarding the cause of his injuries. The ALJ stated that after the October 2001

accident, Plaintiff "was not aware that he was hurt.  However, he reported to treating physicians that" his foot, ankle, and shoulder problems resulted from the accident.  (TR. 52) The ALJ also pointed out that Plaintiff at one time related his abdominal symptoms to the accident and at another time denied an abdominal trauma during the accident.  (Id.)

Although Plaintiff argues that causation is not at issue, the ALJ may nonetheless assess Plaintiff's credibility by considering inconsistencies in testimony.  *Smolen,* 80 F.3d at 1284.  Moreover, testimony concerning "causation" is also appropriate herein given the discrepancy as to when Plaintiff alleges his impairments became disabling.  (*See supra at* pp. 27-29).

When the ALJ asked Plaintiff whether he had been "hospitalized at the time of the accident...", Plaintiff responded: "I didn't know I was even hurt, Your Honor.  It was just like I just stood up, it didn't seem like anything was wrong with me."  (TR. 387) He stated elsewhere in the record that his symptoms caused him to quit work in June (TR. 99), July (TR. 379), or September (TR. 95) of 2002–either date is a considerable amount of time after the October 2001 automobile accident.   The ALJ is correct that Plaintiff reported to treating physicians that he experienced shoulder pain since the October 2001 automobile accident (TR. 209), that he sustained injuries to his ankles as a result of that accident (TR. 195), and "[s]ince that time he has had a problem ambulating..." and pain.  (Id.)  Plaintiff's statement that he did not know he was hurt at the time of the accident and that he "just stood up, it didn't seem like anything was wrong..." does not render his later connection of his injuries to the accident inconsistent.  (TR. 387)  Plaintiff's testimony in response to the ALJ's question concerned his condition immediately after the accident. (Id.)  Plaintiff's statements to his treating physicians reflect that he felt pain *ever since* the accident as well as his belief that the symptoms and injuries were associated with the accident.   There is no medical evidence of record suggesting that such injuries and symptoms, if resulting from the accident, would immediately manifest at the time of the accident as opposed to some time thereafter.

- 33 -

Given the type of symptoms experienced and the lack of evidence of record to support the ALJ's finding, the statements cited by the ALJ are not inconsistent.

Likewise, the evidence cited by the ALJ regarding Plaintiff's statements concerning his abdominal symptoms do not support the ALJ's finding that such statements are inconsistent. The ALJ cited a May 10, 2004 medical report wherein Plaintiff related his abdominal "difficulties to a frontal impact motor vehicle accident one year ago. Apparently, he received chest and abdominal trauma...Since that time, he has had difficulty eating." (TR. 224; *see also* TR. 52 *citing* TR. 224) To establish the inconsistency, the ALJ also cited an April 11, 2004 ER report documenting Plaintiff's complaints of difficulty swallowing, inability to keep food down, and belching. (TR. 52 *citing* TR. 211-214) That record also denotes:

> 1-PMHx: MVC 2 ys ago–shoulder, wrist, finger, [both] legs and feet surgery [illegible]
> ***
> 47 yo male with mult. medical issues s/[illegible] mvc 2 years ago [with] progression n/v + dysphg...
> ***
> pt c/o abdominal pain and usual leg pain hx of mvc last year–...

(TR. 211-214)

The ALJ stated that in one report, Plaintiff was "directly relating" his abdominal problems "to the accident and at another time denying abdominal trauma during at [sic] the time of the accident." (TR. 52) Nothing in the April 11, 2004 medical record suggests that Plaintiff mentioned whether he thought his abdominal symptoms were related to the accident. It is not clear on this record that Plaintiff denied that the accident had anything to do with his abdominal injuries. (*See* TR. 211-214) The ALJ's rejection of Plaintiff's credibility based on inconsistent statements is unsupported.

The records from April 11 and May 10, 2004 do reflect varying references as to how long ago the accident occurred. (TR. 224 (one year ago); TR. 211-214 (two years ago)). Additionally, at the hearing, the ALJ inquired whether Plaintiff's esophagitis and gall bladder removal were related to the automobile accident. (TR. 379) Plaintiff replied:

> That's a question that I've been asking because I'm not the
> doctor. They've got a lot of information, I couldn't say. I know
> that I began experiencing the discomfort–

Q.    [ALJ]: Okay.

A.    [Plaintiff]:–of those issues immediately upon–

Q.    When is the last time you worked?

(TR. 379)

Plaintiff also testified that he stopped working in 2002 because, among other things, he "began experiencing a kind of a distended, bloated abdomen area and it was restricting me, consuming only bowel movements. It was pretty impossible for me to bend over with [sic] losing whatever I consumed. I had no way of keeping food down..." (TR. 379-380) The ALJ did not cite this evidence when making his credibility determination. The court cannot affirm the ALJ's credibility finding based upon evidence that the ALJ did not discuss. *Connett,* 340 F.3d at 874.

>    D.    Conclusion

Plaintiff requests that the Court remand the matter for an immediate award of benefits. Remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the
> evidence; (2) there are no outstanding issues that must be resolved before a
> determination of disability can be made; and (3) it is clear from the record that
> the ALJ would be required to find the claimant disabled were such evidence
> credited.

*Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester,* 81 F.3d at 834.

The ALJ failed to set forth legally sufficient reasons supported by substantial evidence in the record for his determination that Plaintiff could sustain light work activity while on post-operative, non-weight bearing status. The ALJ also failed to properly evaluate the impact of periods of recovery including non-weight bearing status, on Plaintiff's capacity to perform his past work as a respiratory care therapist on a regular and continuing basis. This

does not necessarily mean that Plaintiff is entitled to benefits.  At this point, the record is not sufficiently developed to determine whether Plaintiff could perform his past work as a respiratory care therapist or other work in the national economy.  In either case, the record requires further development concerning the time period at issue, Plaintiff's capacity to perform on a regular and continuing basis his past work as a respiratory care therapist at step four and/or other work, if any, if the analysis proceeds to step five.

Remand is also necessary to assess Plaintiff's allegations concerning the severity of his symptoms. *See Connett,* 340 F.3d at 876 (recognizing that the court is not required to credit pain testimony and instead remanding for reconsideration of plaintiff's credibility); *Bunnell v. Barnhart,* 336 F.3d 1112, 1115-1116 (9th Cir. 2003) (remanding where outstanding issues, including ALJ's reassessment of plaintiff's credibility, must be resolved before a disability determination can be made).  Remand is especially appropriate in this case given that Plaintiff's pain testimony, even if credited, may not necessarily establish his inability to perform substantial gainful activity.  *See id.*

Upon remand, the ALJ should consider all the evidence in the record; make appropriate findings concerning Plaintiff's credibility and lay testimony; and where appropriate, supplement the record with additional evidence including testimony from a vocational expert.  Alternatively, the Commissioner may decide to award benefits. *See McAllister v. Sullivan,* 888 F.2d 599, 604 (9th Cir. 1989).

## VI.    RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court:

(1)     deny Plaintiff's Motion for Summary Judgment (Doc. No. 15);

(2)     deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 18); and

(3)     remand this matter for further proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections

are filed, the parties should use the following case number:  CV 06-167-TUC-CKJ.  A party may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by theDistrict Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 27th day of August, 2007.

_____
Héctor C. Estrada
United States Magistrate Judge